**FILED**

2012 Aug-24  AM 11:26
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

EBONY MELINDA LEWIS,              )
                                 )
        Plaintiff,               )
                                 )
vs.                              )          CIVIL ACTION NO.:
                                 )
THE BOARD OF TRUSTEES OF THE     )
UNIVERSITY OF ALABAMA, public    )
professional education institution and )
MICHAEL S. REDDY, DMD, DEAN of the )
SCHOOL OF DENTISTRY(SOD), as an  )
individual and in his Official Capacity as )
administrator of a federally assisted program, )
Dr. Ken Tilashalski ("Tilashalski"), is the )          JURY DEMAND
Associate Dean of Academic Affairs AND Dr. )
Stephen Mitchell ("Mitchell"), is an Associate )
Professor, Director, Undergraduate Pediatric )
Dentistry Department of Pediatric Dentistry as )
an individual and in their respective Official )
Capacities, as indicated herein.   )
        Defendants.              )

## VERIFIED COMPLAINT

**COMES NOW,** Plaintiff, Ebony Melinda Lewis ("Plaintiff" or "Lewis"), and for her Verified

Complaint against Defendants, The Board of Trustees of The University of Alabama ("Board"), the

Dean of the University of Alabama School of Dentistry ("SOD"), Michael Reddy ("Reddy"), and the

Associate Dean of Academic Affairs, Dr. Ken Tilashalski ("Tilashalski"), and Stephen Mitchell

("Mitchell"), an Associate Professor,  states as follows:

### PRELIMINARY STATEMENT

1. This is an action brought under 42 USC §1983 and Title VI of the Civil Rights Act and the Plaintiff

   further alleges violations against Defendants arising under certain laws of the State of Alabama as

   described below.

2. The Plaintiff contends that the Defendants, The Board of Trustees of The University of Alabama

   ("Board"), the Dean of the University of Alabama School of Dentistry ("SOD"), Michael Reddy

("Reddy"), the Associate Dean of Academic Affairs, Ken Tilashalski ("Tilashalski"), and Stephen Mitchell ("Mitchell"), violated, inter alia, Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq., and its implementing Regulations.

3. The Plaintiff contends she was denied due process and equal protection of law in the provision and administration of federally assisted policies and programs at the hands of the Board, Reddy, Mitchell, and Tilashalski. Plaintiff's contentions arise from the Defendants procedural and substantive deviations from standard academic review and academic appeal procedures that have harmed Plaintiff in that she was wrongfully dismissed from the DMD program in violation of rights protected by contract and the Constitution.

4. The Plaintiff contends she was subjected to a discriminatory campus climate displaying various vestiges of race-based segregation, raced-based discrimination, and a well-documented history of exclusion, de facto segregation and that said actions substantially impaired or interfered with her ability to perform contractual obligations and were in violation of constitutional rights.

## PARTIES

5. Plaintiff, Ebony M. Lewis is a citizen of the United States and is a resident of Alabama. Lewis is a member of a protected class as an African-American female and a student previously enrolled in the DMD program at The University of Alabama at Birmingham School of Dentistry.

6. The Board of Trustees of the University of Alabama is, upon information and belief, comprised of self-selected and self-perpetuating officials who are responsible for policy and governance of the University of Alabama system, including The University of Alabama at Birmingham ("UAB"). It receives federal funds, inter alia, in the forms of student grants, student aid, research grants, and other sources of federal funds.

7. Dr. Michael S. Reddy, Dean of the School of Dentistry, was the final decision maker in the appeals process at the SOD and denied Rollins due process and equal protection.

2

8. Dr. Ken Tilashalski ("Tilashalski"), is the Associate Dean of Academic Affairs ("Associate Dean"), and Chair of the Academic Performance Committee ("APC"). The APC is charged with monitoring and assessing the academic status of students in the DMD program.

9. Dr. Stephen Mitchell ("Mitchell") is an Associate Professor, Director, Undergraduate Pediatric Dentistry Department of Pediatric Dentistry, and a member of the Academic Performance Committee ("APC")/ Faculty Council and based upon information and belief, is a member of the Alabama Dental Association.

## JURISDICTION

10. The jurisdiction of this court is invoked pursuant to 28 U.S.C. §1331, 42 U.S.C. §1981, 42 U.S.C. §1983 and 42 U.S.C. §2000 (d) et seq., Title VI of the Civil Rights Act of 1964, as amended.

11. The jurisdiction of this court is invoked to secure protection for and to redress the deprivation of rights secured by 42 U.S.C. §§2000d, et seq. Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §1983, and the 14th Amendment to the Constitution of the United States and the power to grant declaratory relief is conferred on this Court by 28 U.S.C. §2201, et seq.

12. This Court has supplemental jurisdiction over the state law claims asserted in the complaint, in that the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the Constitution. The state law claims do not raise novel or complex issues of State law, do not substantially predominate over the federal law claims, and there are no compelling reasons for declining to exercise jurisdiction over the state law claims. Accordingly, Plaintiff invokes supplemental jurisdiction over the state law claims raised herein.

13. Venue is proper in this district in that all of the named defendants reside or are found within this district and the claims of the plaintiffs arose in this district.

## BACKGROUND INFORMATION

14. Lewis' experience as a first year student was riddled with instances in which the SOD administrators, faculty, and staff failed to adhere to its self-imposed academic review standards and evaluation

procedures. The omissions and deviations substantially impaired the impartiality of the review process, were discriminatory, and in violation of the Constitution.  As a result, Lewis was wrongfully dismissed, deprived of a meaningful opportunity to complete the DMD program, and her ability to fulfill contractual obligations to a third party was substantially impaired, if not completely extinguished.

15. Alabamians, like all, Americans share a common historical and cultural heritage in which racism has played and still plays a dominant role. Yet, most of us are often unaware of our racism.

16. We do not recognize the ways in which our cultural experience has influenced our beliefs about race or the occasions on which those beliefs affect our actions. This holds true for all, including those acting on behalf of state institutions and especially to the racial climate of a college campus.[1]

17. The University of Alabama System, including the University of Alabama at Birmingham (UAB) Campus, is certainly not immune to the forgoing, and its history of racial discriminatory actions is well-documented.

18. In many instances, the behavior that produces racial discrimination is intentional, but arguably more often than not, it is influenced by 'subconscious' racial motivations. In the context of social justice or moral justice, the distinction of whether the discriminatory policy or program is intentional or not is moot. The harm caused by the discriminatory act is not affected by the intent of the actor.

19. An ill will, malicious mind, or a hardened heart is not necessarily required for one to be deemed a discriminatory actor or the source of an act having a discriminatory impact.

20. Systems, inclusive of checks-and-balances, standardized procedures and impartial review at each level of decision-making, collectively tend to serve to control such subconscious discriminatory actions.

---

[1] The psychological dimensions of the campus racial climate relates to individuals' views of group relations, institutional responses to diversity, perceptions of discrimination or racial conflict, and attitudes toward those from other racial/ethnic backgrounds than one's own.

21. In the absence of the safe guards, organic partiality and natural biases will reign. Predominant cultural and racial predispositions will influence both the decision-making process and most especially, the decision maker.

22. In the instant matter, the Plaintiff will establish that the Defendants failed to maintain such safeguards and that these failures constituted a procedural and substantive deviation from self-imposed norms[2], that the statements and actions occurring throughout the Plaintiffs enrollment at the SOD, and particularly during the administrative history of the decision-making process lays bare the disparate treatment suffered by the Plaintiff. Moreover, the Plaintiff experienced extenuating circumstances which should have precipitated responsive action by the SOD faculty and staff in the form of a bereavement leave, voluntary withdrawal, academic bankruptcy, or another proactive action addressing the difficulty the Plaintiff faced upon losing her grandmother and nearly losing an uncle.

23. Although there is substantial justification and persuasive rationale in support of administrative autonomy and judicial restraint in matters which are deemed to involve purely academic decisions, an analysis of the extent to which an institution has developed and maintained standardized procedural and administrative safe-guards, its integrity as it relates to academic review procedures and its commitment to non-discriminatory conduct is certainly within the province of this court.

## STATEMENT OF FACTS

24. Lewis was accepted into the University of Alabama School of Dentistry and has completed her first year. She earned the prestigious, Star Student Scholarship (3S), which is a scholarship "available to a very limited number of students and represents [the SOD's] effort to continue to attract the best students to the [SOD]" based on exemplary academic performance, service to community, and

---

[2] The policies were established by the SOD Academic Guidelines, comparative DMD program student cases, and the Commission of Dental Education Handbook.

commitment to achievement. [3] Lewis' interest in becoming a dentist is deeply rooted in a strong sense of social and community responsibility and a habit of personal achievement.

25. After reading an article entitled "Want of Dental Care," which describes the story of a youth who suffered from an abscessed tooth which ultimately proved fatal, Lewis recognized that through increased dental care access and dental health awareness, a life would have been preserved. From that point, Lewis was decidedly of the mindset to address the dental health needs of under-served communities. She began to prepare in earnest for not just a career, but for a purpose--a life mission in which she would meet the dental health needs of under-served communities.

26. Lewis developed a vision and course of action that would drive her to become the first member of her immediate family or extended family to matriculate to a professional institution of higher learning.

27. Long before matriculating to the SOD, Lewis established a record of commitment to achievement, perseverance and solidified her commitment to become a socially-conscious professional as a member of the dental profession. While completing a rigorous undergraduate program at the University of South Florida ("USF") with a Bachelor of Science degree in Psychology (3.66 GPA)[4], Lewis completed a dental internship, and participated in various preparatory extracurricular activities such as the Pre-dental Society, the Minority Pre-Professional Science Society, and Habitat for Humanity.[5]

28. The amalgamation of determination, hard work, and exemplary academic performance facilitated the attainment of admission to the SOD and the award of several prestigious scholarship awards.

29. For instance, Lewis received a full tuition scholarship sponsored by the National Health Service Corps ("NHSC"). NHSC, is a scholars program promoting social consciousness and social awareness amid the health care professional community. NHSC provides students pursuing careers in primary care with scholarships to cover academic costs and living expenses during the student's course of study.

---

[3] (see Scholarship Award Letter-Steven J. Filler, DDS, MS, MA, in his official capacity as Associate Dean, SOD)
[4] USF Transcript Attached.
[5] Each of the foregoing extracurricular activities were completed in the city of Tampa, Florida during Lewis' undergraduate studies at the University of South Florida. In addition to participation in these programs, Lewis developed and honed musical talents while playing the alto saxophone for over eight years.

30. In exchange, the student agrees to serve low income communities' needs for dental healthcare services. Upon completing the DMD program and subsequent training, the scholar joins a network of primary health care providers and sites dedicated to building healthier communities with limited access to care.

31. If the scholar is unable to meet any of the contractual conditions, the scholarship is converted to a loan subject to immediate repayment in full.

32. NHSC offered and Lewis accepted the scholarship for the purpose of completing the DMD program at SOD.

33. Lewis has incurred over $90,000 in tuition expenses, fees, educational costs, and living expenses in the course of completing the first year of the DMD program.

34. As a result of the wrongful dismissal, Lewis is responsible for repayment of the full balance of the NHSC scholarship. She will not have a meaningful opportunity to transfer to another DMD program or seek admission to other DMD programs, and moreover, Lewis is effectively deprived of the opportunity to serve under-served communities' dental healthcare needs as a dentist.

35. Lewis completed the first semester of the DMD program with a GPA of 2.89 on 4.0 scale. She received a grade of an "A" or an "B" in seven (7) of the nine (9) numerically graded courses for the first semester of the DMD program.[6]

36. During Lewis' second semester, she was enrolled in Cardiovascular and Renal Systems ("Cardio/Renal") a required course under Dr. Carie Elzie, the course instructor.

---

[6] As stated above, Lewis successfully completed the first semester of the D1 academic year with a GPA of 2.89. Attempting 38.00 hours and completing 100% of the courses for a total of 38.00 Earned hours. 35.00 hours of the 38.00 hours qualify as 'GPA Hours' based on 101.00 Quality Points. 101.00/35.00 provides for the 2.89 GPA. Of the eleven (11) courses completed, two (2) of the courses were Pass/Fail and thus have no bearing on the calculation of GPA, whereas the remaining nine (9) courses assigned a numerical score and ultimately a 'grade assignment.' Of the remaining nine (9) courses, Lewis received two (2) "A" grades and five (5) "B" grades. The two courses in which Lewis received a "C" disproportionately represented twenty six percent (26%) of the total credit hours awarded for the semester while representing roughly eighteen percent (18%) of the semester's academic course load that is in terms of total courses completed.

37. The course syllabus for Cardio/Renal provides for remediation and represents to "create a professional partnership between [Lewis], the students, [Dr. Elzie], and the lecturers of this module" (See Course Syllabus Attached).

38. Lewis, after completing the first year of the SOD program with an overall 2.38 GPA, was dismissed from the SOD program after receiving a numerical grade of 65 in Cardiovascular and Renal Systems.

39. At all times relevant to this action, Lewis has maintained a grade point average above 2.0, as required in the SOD guidelines.

40. In a class comprised of 56 students, Lewis is one of two African American students. Based upon information and belief, the maximum class size is sixty-five (65) students and of the four classes currently pursuing a DMD at the SOD, the number of black students in the respective class is estimated as follows: First Year-2, Second Year-4, Third Year-1, Fourth Year-1, Incoming Class– 4.

41. As indicated above, Lewis is passionate and committed to providing dental care to under-served communities.

42. Lewis contends that she regularly experienced racially and culturally insensitive comments during peer-review sessions and instructor-lead discussions. Upon the occurrence of these events, no adequate corrective action or guidance was provided by the course instructor, administrator, faculty or staff member.

43. Even as a highly talented student, Lewis' perception of racial tension, between groups on campus, and the resulting feelings of isolation related to her racial identity caused a substantial negative effect on her ability to perform academically.

44. As described herein and below, the SOD failed to follow its own self-imposed Academic Guidelines and failed to provide adequate consideration or relief to Lewis in response to the extenuating circumstances she faced during the first and second semester in at least the following ways:

        a.   failure to provide formal tutoring services per the Commission of Dental Education, the Cardio and Renal Course syllabus, and the Academic Guidelines;

b.   failure to provide and make available in a timely manner and counseling services per the Commission of Dental Education handbook (American Dental Association);

c.   failure to take a broad-based perspective approach in the decision-making process and failure to consider all relevant factors in evaluating the students fitness to continue in the DMD program;

d.   failure to provide an impartial academic review process namely in denying Lewis a meaningful hearing before an unbiased neutral board prior to the final dismissal;

e.   failure to provide a campus community and classroom climate welcoming diversity of thought and experience;

f.   failure to be sympathetic to the concerns of the individual student and provide mandatory accommodations for variances caused by unforeseeable family exigencies and the untimely loss of a family member;

g.   failure to provide the minutes or notes from the hearing held before the Academic Performance Committee/Faculty Council as required.

45. As stated in the SOD Academic Guidelines, "the responsibility of the University of Alabama at Birmingham School of Dentistry (SOD)" includes the academic oversight of all students pursuing the DMD degree. The Academic Performance Committee (APC) is charged with "monitoring and assessing the academic status of students in the DMD program. The Associate Dean of Academic Affairs serves as Chair of the APC. The APC will meet on a regular basis…[to] review grades and other material pertinent, to student progress and evaluate the information as it relates to establish school policy. Based on this information, the APC will make recommendations to the Associate Dean regarding promotion, probationary status, repetition, remediation, and dismissal. [A]cademic decisions will be governed by the version of the Academic Guidelines in place at the time of the decision."

46. Lewis experienced several extenuating circumstances – namely, the unexpected death of maternal grandmother on or about October 1, 2011, and Lewis' maternal uncle suffered a massive stroke on or about February 13, 2012, and was hospitalized in Atlanta, Georgia, through April 2012.

47. Each of the incidents were unforeseeable, significantly disruptive, and beyond Lewis' control.

48. Although the plaintiff initially attempted to independently-manage and internalize the resulting grief, the events negatively affected Lewis' academic performance and caused her to experience somatic issues –restlessness, anxiety, and mild depression - necessitating several trips to the University of Alabama Birmingham Student Health Facility.

49. Since the dismissal, Lewis has continued to receive said counseling services and treatment.

50. On or about September 15, 2011, Lewis was informed that her grandmother was ill and had been hospitalized. Within two weeks, the plaintiff's maternal grandmother had passed away.

51. Lewis did not receive any offer for grief counseling or an official leave of absence.  Largely due to her commitment to the SOD program and the unexpected nature of the death, Lewis did not visit her grandmother prior to death.

52. Lewis shared a close familial tie and bond with her grandmother, and naturally, she was more distraught by the loss because she did not have an opportunity to say farewell or to communicate sentiments that were previously unspoken.

53. On or about February 13, 2012, the Plaintiff was informed that an uncle had suffered several massive strokes and was subsequently hospitalized until March 19, 2012. Lewis made regular trips to Atlanta to visit her uncle during his hospitalization and the subsequent rehabilitation.

54. Due to the recent sudden loss of her grandmother and the close familial bond with her uncle, Lewis was especially determined to provide support for her uncle and family during his hospitalization and recovery period.

55. Although Lewis did not receive an offer or formal consideration for leave of absence, repetition, 'academic bankruptcy' or any other meaningful consideration during either period of hardship, Lewis managed to perform at an average level for all of her courses save Cardiovascular and Renal ("Cardio/Renal") in which she did not receive a passing grade.

56. By the time Lewis realized the extent of her academic difficulties in Cardio/Renal, much of the academic harm was beyond repair within the time constraints of the semester.

57. Throughout the Cardio/Renal course, Lewis was regularly driving to Atlanta on weekends to be with her family, and she often made the trip during the weekdays, as well.

58. The SOD guidelines and the American Dental Association accreditation standards mandate consideration of the forgoing factors in the academic evaluation process.

59. Lewis did not receive the required consideration for assistance, nor did she receive an offer of leave of absence, voluntary withdrawal, repetition etc. and was ultimately dismissed from the SOD.

60. On or about May 15, 2012, Lewis received a grade of 65 (D) for Cardio/Renal and was then subsequently advised that she would have an opportunity to take a remediation exam consisting of 100 multiple choice questions requiring a score of 70.

Detailed Timeline of Relevant Events

May 31st

61. Less than a week before Lewis was scheduled to take the remediation exam for Cardio/Renal, Tilashalski told Lewis that the course instructor was keeping him informed of Lewis' performance and that if there was a need for counseling services, such services were available.

62. On the same day, Lewis set an appointment to meet with an on-campus grief counselor.

63. At 1:00 pm on the same day, Lewis sat for the remediation exam.

64. Lewis did not receive an offer for any tutoring services prior to the exam.

65. On or about June 2nd, Lewis received a grade of 59/100 on the remediation exam.


June 12th

66. Lewis met with Tilashalski to discuss the procedure for the Hearing before the Academic Performance Committee (or Faculty Council).

67. During the conversation, Lewis was asked whether her parents were dentists, and she replied, "No, they did not attend college, but they are extremely supportive of my academic studies."

68. As required by the SOD - Academic Guidelines, Tilashalski stated the APC would take a broad perspective approach in the decision making process and would consider all relevant factors.

11

June 22nd

69. Lewis received a call from Tilashalski informing her she had been dismissed from the SOD, and she was told that previous students who have recycled the first year would continue to have a trend of poor or marginal performance.

70. Immediately after ending the call with Tilashalski, Lewis called John Ruby, Associate Professor, ("Ruby") to provide notice of her intent to appeal the APC's decision, but she received no answer. She called (3) times consecutively, but there was no answer.

71. Lewis then called Tilashalski's assistant, who stated she would refer Lewis to the correct contact for filing an appeal after confirming the information with another person in the office. Lewis left her number with the assistant and was told she would receive a follow up call in ten minutes.

72. Ten minutes elapsed, but Lewis never received a call. Lewis then called the assistant, but no one answered. Lewis immediately called the assistant again, but on this occasion, she tried from another number, which was unknown to the assistant. Tilashalski's assistant answered, but only to then refer Lewis back to Ruby's office.

73. Lewis once again started to feel as though there was an intentional effort to unduly delay the appeal and that she was being excluded.

74. Later that day, Lewis contacted the class president to request information on the appeal process and to request a letter of recommendation, which he provided. He suggested that Lewis deliver the notice of appeal letter to Ruby directly and then to go speak with Reddy about the appeal process and the extenuating circumstances contributing to the Cardio/Renal grade assignment.

75. At this time, Lewis had only one week to file the notice of appeal given the deadline of June 29th.

June 25th

76. Frustrated but not deterred, Lewis proceeded to Reddy's office. Upon arriving, Mitchell was already there, speaking to one of Reddy's assistants. As Lewis entered the room, she overheard Mitchell

stating "straight C's are unacceptable." Then Mitchell walked out, appearing startled to have seen Lewis right after making his contemptuous comments.

77. Upon hearing Mitchell's comments, Lewis began to feel as though the dismissal was all but a foregone conclusion and that the appeal process was but a mere pretense.

78. However, she proceeded to speak with the same assistant, to which Mitchell had just expressed his contempt. The assistant insisted on setting the appointment for June 28th, but given the pending deadline, Lewis requested an earlier date. The assistant then informed Lewis that Mitchell would have to meet with Reddy prior to Lewis' meeting with Reddy. Lewis was becoming less confused by the seemingly inexplicable behavior and began to form the conclusion that Mitchell was determined to preserve the APC's decision to dismiss Lewis by and through his continued interference with the academic appeal process and intimidation tactics.

79. Lewis was told by the assistant that she could meet with Reddy at 3:30 pm on June 24th and that Mitchell's meeting with Reddy would begin at 2:45 pm on the same day.

June 26th

80. Lewis contacted the class president to set a time to pick up the recommendation letter. They agreed to meet the next day at noon. Prior to the meeting, the class president contacted Lewis to postpone the meeting until 2:00 p.m. in order to allow the class president an opportunity to meet with Mitchell and his wife (each is an APC member and Faculty Council Committee) at 1:00 p.m.

81. Once again, Lewis began to feel as though Mitchell was intentionally interfering with the appeal process and attempting to unduly control its outcome.

82. Based upon information and belief and based on his previous record, Mitchell had reached a decision prior to Lewis even filing a formal notice of appeal, prior to hearing testimony as to why the dismissal should be reversed or affirmed, and maybe most disturbingly, Mitchell was intent on influencing all other decision-makers to agree with him prior to a formal hearing on the matter.

83. Based on guidance and direction provided by the class president, Lewis met with Reddy. Lewis informed Reddy of the recent loss of her grandmother and of her uncle's ongoing heart condition.

84. Lewis informed Reddy of how the frequent trips to Atlanta to visit and care for her ailing uncle had taken away from time allotted for study. To make matters worse, the circumstances occurred during or just prior to what is widely held by DMD students to be the most difficult semester in the DMD program.

85. Again Lewis felt isolated, excluded, and misunderstood, and she was in near disbelief. After all of her hard work, sacrifice, and unwavering will to succeed, how could anyone, let alone the Dean, question her drive to become a dentist or her bona fides as a DMD student.

86. Based on representations made during the admissions process, Lewis reasonably believed that upon admission to the SOD, she would become a member of a community welcoming diversity of thought and experience.

87. Based on representations made in the Academic Guidelines, Cardio & Renal Course Syllabus, Lewis reasonably believed the SOD faculty would be considerate of extenuating circumstances and account for variances caused by unforeseeable family emergencies.

88. Each of the forgoing beliefs were quickly withering away, but Lewis persisted, informing Reddy that she was committed to remaining in the DMD program and that the loss of her grandmother and her uncle's illness had taken a toll on her academic performance and if given the opportunity she believed she deserved, Lewis would duly complete any necessary remedial actions.

89. Reddy informed Lewis the decision was not his to make and that the APC and Faculty Council makes the recommendation and that she could deliver the appeal letter to Ruby or leave it with Reddy.

90. Lewis informed Reddy she had been instructed to give the appeal letter to Ruby, but she had also been told that Ruby would not be in the office until Friday. Lewis perceived a look of disbelief on the face of Reddy upon his hearing that Ruby would be out of the office until Friday, but upon inquiry, there was no response given. Reddy responded by saying, "Well we are working on it," and then he recommended Lewis obtain a faculty advisor for the appeal.

June 27th

91. Lewis delivered the notice of appeal letter to the Dean's office (Reddy). The assistant receiving the notice time stamped it, provided a receipt to Lewis and then stated that she would deliver the notice to Ruby.

92. Later that day, Lewis called Ruby's office to confirm receipt of the notice. To her surprise, Ruby answered the call directly and confirmed receipt. Lewis' belief that Ruby was in the office, even though she had been told he would be out of the office until Friday, affirmed her growing suspicions that the members of the faculty and staff had intentionally attempted to thwart her efforts to appeal the decision of dismissal.

June 28th

93. Lewis received an email from Ruby providing notice as to the date when the faculty council would hear Lewis' testimony which would be held on July 3rd which left Lewis with five (5) days to prepare for what was arguably the most important day at this early stage of her dental career.

94. Thereafter, Lewis met with the assigned faculty counselor to prepare for the upcoming hearing.

July 3rd

95. Lewis appeared before the Faculty Council, along with the assigned faculty counselor, and two (2) other supporting witnesses.

96. After all of the disorientation and haphazard actions, Lewis was physically, emotionally, and mentally drained at the time of the hearing.

97. Ruby gave the opening remarks, in a long drawn out fashion; he gave the name of each member on the council, detailed the procedure and stated the importance of adherence to the proscribed procedural requirements.

98. Only one question was posed to Lewis during the hearing. The question did not concern the course at issue – Cardio/Renal - which furthered indicated to Lewis that the board had prejudged the matter.

99. Lewis did not believe there was any genuine interest in hearing her testimony or her account of the events contributing to the dismissal.

July 11

100. After waiting a full seven (7) days without receiving a determination by the Faculty Council, Lewis contacted Reddy's office to follow up on the hearing, but she was told he was not available and so she left a message requesting a return phone call.

July 12

101. After not receiving a return call, Lewis called Reddy's office once again. The assistant, who answered the call, stated that Lewis had called Academic Affairs. Lewis found this response odd at best. She was certain she had dialed the appropriate number because the number was a stored contact saved on her cellular phone. Nonetheless, she was told that the call would be "properly" transferred. Upon waiting several minutes, Reddy answered the phone and told Lewis that the board recommended dismissal.

July 24th

102. Lewis visited the Academic Affairs office to pick up her academic file, including the minute from the Appeal hearing (per Academic Guidelines the file should contain minutes from the Appeal). The office clerk seemed surprised by the request and stated the minutes are not included in the student's academic file. Edwards ended the conversation by telling Lewis that she would call Lewis later in the day upon speaking with the Admissions Director.

103. On July 25th, after not receiving a follow up call, Lewis called Edwards and was informed to visit the office later in the day. When Lewis arrived, Edwards provided a packet of documents that were not responsive to Lewis' request and that did not include the minutes.

FEDERAL CLAIMS

COUNT 1
DECLARATORY RELIEF
*(As to each and every Defendant)*

104. This is an action for declaratory and injunctive relief against the Defendant.

105. All paragraphs of this complaint are incorporated herein as if fully restated.

106. Lewis contends the Defendants had no right to fail to provide or to fail to provide impartially to Lewis, the benefits and considerations as described in the Academic Guidelines, the Cardio/Renal syllabus, and other governing authority as described herein and above.

107. Lewis contends she has a right to continue in the SOD and to enter into contract with NHSC free from the Defendant's unlawful and tortuous interference.

108. Alternatively, Lewis contends that she has a right to avoid an effective permanent ban on completing a dentistry program beyond the confines of the UAB SOD campus. Defendants have effectively deprived Lewis of this right by way of the unlawful and unconstitutional dismissal which will remain on her academic record indefinitely.

109. Lewis is being denied and deprived of the constitutional and contractual rights described herein by Defendants unlawful acts and policies.

110. As a proximate result of the Defendant's unlawful actions, Lewis continues to suffer the irreparable harm described above for which monetary compensation is inadequate.

111. There is a substantial likelihood that Lewis will ultimately prevail on the merits of her claim.

112. Lewis prays that this Court will preliminarily and permanently enjoin the Defendant from continuing the acts complained of herein and that the Defendant is instructed to grant Lewis' readmission into the SOD or in the alternative to permit a voluntary "student initiated" withdrawal as outlined by the Academic Guidelines based on the special circumstances described herein. Lewis seeks all other relief to which she proves she is entitled including an award of a reasonable attorney's fee and costs in this action.

COUNT 2
CIVIL RIGHTS ACT AND TITLE VI VIOLATION
*(Race-based Discrimination – Federally Assisted Program as to each Defendant in his/her Official Capacity)*

113.   All paragraphs of this complaint are incorporated herein as if fully restated.

114.   Defendants' use of racial, ethnic, socio-economic background criteria in administering federally assisted higher education policies and programs, violates the provisions of the Fourteenth Amendment to the Constitution of the United States, the provisions of 42 U.S.C. §1983, and the provisions of Title VI (42 U.S.C. §2000d, *et seq.*).

115.   Defendants' actions were motivated by unconstitutional purposes and an intent to discriminate.

116.   Defendants' actions have a disparate impact on groups protected by the statute, namely non-white students and African American students.

117.   Defendants' attempts to use pretext and subterfuge to engage in such unconstitutional and unlawful discriminatory actions constitute violations of those provisions and necessarily subject those certain actors to the jurisdiction of this court.

118.   Defendants have no sufficient evidence of any important or compelling interest in the use of such criteria in its academic decisions generally or for dismissal decisions in particular.

119.   Moreover, the Defendant has not sought to tailor its use of racial, ethnic, and socio-economic background criteria in an appropriate manner in its student retention policies generally or in its administration of academic review policies and practices services.

120.   Lewis has been and will continue to be damaged thereby.

121.   Lewis claims all damages allowable under law.


COUNT 3
CIVIL RIGHTS ACT VIOLATION
*(Due Process Violation as to each Defendant in his/her Official Capacity)*

121.   All paragraphs of this complaint are incorporated herein as if fully restated.

122.   Lewis has a property interest in her rights and expectations (including by not necessarily limited to, completion of the SOD program, future earnings, recoupment of substantial investment in

education expense, NHSC Scholarship Award, and to fulfill the associated contractual obligations) arising out of and from her status as a DMD program student, the implied contract with SOD, and the contract with the NHSC Program.

123. Defendants' unlawful dismissal from the SOD and termination of that contract deprives the plaintiff of property without due process of law, in that, it is inter alia, arbitrary, pretextual, and occasioned by the desire to engage in unlawful and unconstitutional racial, ethnic, and socio-economic discrimination.

124. Lewis contends the dismissal and the failure to account for an involuntary hardship (i.e. course absences caused by family-based exigencies) represents a substantial departure from accepted academic norms and demonstrates that the Defendants did not actually exercise professional judgment in good faith or in the constitutionally required impartial manner.

125. Lewis contends that the defendants engaged in a substantial departure from their own guidelines the guidelines of the National Board of Dental Examiners/American Dental Association (NBDE/ADA) and furthermore applied the guidelines inconsistently based on protected factors.

126. Lewis has been and will, in the future, be damaged by that deprivation.

127. Lewis claims all damages allowable under law.

## STATE LAW CLAIMS

### COUNT 4
### BREACH OF CONTRACT
*As to the Board of Trustees, Reddy, Tilashalski, & Mtichell*

128. All paragraphs of this complaint are incorporated herein as if fully restated.

129. Upon accepting admission to the SOD, Lewis entered a binding contract with the Defendants.

130. The terms of the agreement are largely represented by the terms contained within the Academic Guidelines and are supplemented by course syllabi provided to Lewis.

131. In maintaining a GPA above 2.0, Lewis fulfilled her obligations under the terms of the agreement.

132. Defendant breached the agreement with Lewis in at least the following ways:

    i.   The Defendant in failing to adhere to the terms of the agreement as provided by the Academic Guidelines;

    ii.   by not considering the impact that the familial hardship may have imposed on Lewis' academic performance;

    iii.   failing to provide appropriate relief in a timely or proactive manner;

    iv.   failing to adhere to an impartial systemic review and appeal process.

133.    As the direct and proximate result of the Defendants breach, Lewis was damaged thereby.

134.    Lewis claims all damages allowable under law.

COUNT 5
**INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP**
*As to Reddy, Tilashalski, & Mitchell, to each individually*

135.    All paragraphs of this complaint are incorporated herein as if fully restated.

136.    Lewis, as a DMD program student and scholarship recipient (NHSC Scholar Program), has a right to do business in a fair setting that is protected. Moreover, Lewis has a right to pursue a professional dental career committed to serving the dental needs of under-served communities under the employ of corporate or individual entities.

137.    As more specifically described above, Lewis entered a binding contract and otherwise had a business relationship with the National Health Service Corps of which those certain Defendants had knowledge of or should have had knowledge of its existence.

138.    With knowledge of the contractual relationship between Lewis and the NHSC and of Lewis' commitment to meet the dental needs of underserved communities, those certain defendants intentionally interfered with said contractual relationship and as the direct and proximate result of Defendants actions, Lewis was damaged thereby.

139.    Defendants' actions constitute prohibited interference and cannot be justified by any legitimate purpose.

140.    Lewis claims all damages allowable under law.

COUNT 6
### NEGLIGENT SUPERVISION/TRAINING/RETENTION OF ACADEMIC FACULTY STAFF AND ADMINISTRATORS
*As to the Board of Trustees, Reddy*

140.    All paragraphs of this complaint are incorporated herein as if fully restated.

141.    A claim for negligent hiring is based on the principle that an employer is liable for the harm resulting from its employees' negligent acts in the employment of improper persons or instrumentalities in work involving risk of harm to others.

142.    The Defendant hired, supervised, and/or trained incompetent agents or employees who committed some or all of the wrongful acts set forth in this Complaint.

143.    Defendant's employees spoke with Plaintiff on a frequent and ongoing basis, engaging in dismissive and discriminatory behavior for which there is no legitimate purpose or reasonable rationale.

144.    Defendant's agents have refused or otherwise failed to follow its own self imposed guidelines, and moreover, its actions with respect to Lewis veered from any cognizable systemic academic review process. As described herein and above, a review of the relevant sequence of events lays bare the incompetence of Defendant's agents/employees.

145.    The Defendants are liable for the actions of its agents or employees because Defendants knew or should have known its agents or employees were predisposed to committing the wrongs (absent standardized impartial academic review procedures with independent checks and balances), yet placed certain agents or employees in a position in which they could have and, in fact, did commit a wrong against Lewis.

146.    As described herein and above, Defendant knew or should have known of the incompetence of its agents or employees.

147.    Defendant knew or should have known the actions of its agents or employees constituted a continuous or ongoing tort.

148.   Defendant was negligent or reckless in its hiring, supervision, retention and/or training, and as the employer, Defendant failed to take "adequate" steps to remedy the situation.

149.   This negligence is a direct and proximate result to the damages suffered by Plaintiff.

150.   Lewis claims all damages allowable under law.

COUNT 7
INVASION OF PRIVACY
*As to Reddy, Tilashalski, & Mtichell, to each individually*

151.   All paragraphs of this complaint are incorporated herein as if fully restated.

152.   Although the Constitution proscribes no direct right of privacy, but as widely held, the right is implicitly conferred by the Bill of Rights and extends to the right of privacy of beliefs, the right to be free from interference in one's pursuit of life, liberty, and the harmonious interaction with fellow citizens and community members.

153.   The right to privacy certainly extends to a student's pursuit of entering the dental profession for the purpose of meeting the needs of those who are arguably in the greatest need of dental care. Whether from the view of the individual or the collective masses (save those who consider affordable dental care as unfair competition), Lewis' realization of her goal – providing dental care to all in need without regard to the patient's ability to pay -- could hardly be said to infringe on the liberty of another.

154.   At some time prior to the events described herein, defendants formed a student/faculty relationship with Lewis based on their respective role as agents or employees within the SOD. However, the actions complained of against defendants are alleged to each individually, as their actions were not within the scope of their respective proscribed official capacities or the intended authority granted, and therefore the protections afforded to the state and its actor under the theory of sovereign or governmental immunity is not applicable and should not be afforded to the certain named defendants.

155.   Plaintiff, via email and in several conversations with an agent or employee of defendants, explained to defendant that Plaintiff Lewis had experienced two separate extenuating circumstances that contributed to Lewis' "marginal" academic performance.

156.   At all times relevant to this action, certain defendants began a systematic campaign against the plaintiff, while knowing or having information from which it could easily be confirmed and verified that the plaintiff was not due to receive the harshest and most severe penalty (i.e. dismissal). Specifically, those certain defendants met with Lewis to discuss alternatives to dismissal which led Lewis to reasonably believe enrollment in the SOD would continue.

157.   Certain defendants further continued to delay the academic review process and frustrated the process by unduly influencing decision-makers in the review process and deprived Lewis of a meaning opportunity to receive the constitutionally required review procedures prior to the deprivation of a protected interest.

158.   This conduct was calculated to deprive Lewis of meaningful due process and had the effect to result in great embarrassment, humiliation, and mental distress incurred by Lewis, as the certain defendants deliberately spoke in such a tone of voice, were motivated by factors such as preserving vestiges of discrimination and classism and acted with such callous regard for Lewis as to embarrass plaintiff before other members of the faculty, staff, and classmates.

159.   Plaintiff again explained that she was committed to taking the steps required to resume enrollment, including repetition, but the certain defendants persisted with their demands stating that people from certain backgrounds tend to do better in the DMD program than others.

160.   Thereafter, the certain defendants continued to delay and engage in avoidance tactics throughout the appeal process.

161.   The conduct of the defendant described herein constitutes a wrongful intrusion and an invasion of the plaintiff's privacy.

162.   As a direct and proximate result of the above described conduct of the defendant, plaintiff has incurred great mental and emotional distress; she has been made ill as a result of this mental and

emotional distress, has lost the benefit of a full tuition scholarship to which she will now have to repay out-of-pocket, has lost future earnings from future employment opportunities, and has lost the opportunity to fulfill the socially conscious mission of providing dental care to under-served communities; plaintiff further claims punitive damages, which if awarded, should be submitted to a non-profit organization with a stated mission of providing dental care to under-served communities.

163.    Lewis claims all damages allowable under law.

PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests the following relief:

1.  Preliminarily and permanently enjoin the defendants from using (or permitting, encouraging, or requiring the use) of non-socially conscious racial, ethnic, or socioeconomic discriminatory criteria in the academic review process and the associated administrative review process.

2.  Preliminarily and permanently enjoin the Defendants from retaliating against the Plaintiff for raising the stated objections and bringing this action;

3.  Preliminarily and permanently enjoin the defendants from preventing or frustrating dental students and future dental professionals participation in programs serving the dental care needs of under-served communities, encouraging dental students to develop a myopic and fatally flawed view of their respective roles in society as members of a trusted profession, or failing to encourage dental students and future dental professionals to more fully appreciate the immense value in promoting affordable access to dental care.

4.  Award Lewis punitive damages against the defendants in their individual capacities in an amount to be determined by a jury of her peers at trial (which plaintiff believes should be at least $5 million to be awarded in whole to American Dental Association (ADA) approved non-profit organizations

committed to improving access to dental care for under-served communities and/or to the Community

Dental Health Coordinator (CDHC) Program[7] sponsored by the ADA).

5. Grant Plaintiff an order requiring Defendants to make Plaintiff whole by granting the appropriate

   declaratory relief, lost benefits, lost opportunities, reinstatement, compensatory and punitive damages;

   and

6. Grant Plaintiff a permanent injunction enjoining Defendants, its agents, successors, employees,

   attorneys and those acting in concert therewith from continuing to violate 42 U.S.C. 2000(d);

7. Plaintiff prays for **such other and further relief as to the court may seem just, proper, and**

   **equitable,** including if so warranted by the merits of the claims raised and supported by applicable

   authority, her costs, and a reasonable attorney's fee as incurred herein.


Respectfully submitted,

/s/ Richard A. Rice (RIC086)

Richard A. Rice
*Attorney for Plaintiff, Ebony Lewis*

Vulcan Legal Group, LLC
South 2229 1st Avenue
Birmingham, Alabama 35233
Suite 225


### DEMAND FOR TRIAL BY JURY

---

[7]The American Dental Association has been promoting oral health care through community based initiatives since its inception. In 2006, the ADA House of Delegates established the Workforce Models National Coordinating and Development Committee (NCDC) to create a Community Dental Health Coordinator (CDHC) model training program. The program is an initiative to bring oral health care to under-served communities and is being piloted in three locations. http://www.ada.org/cdhc.aspx

## VERIFICATION

I, Ebony M. Lewis, having been duly sworn depose and state that I have read the foregoing

Complaint and that the information stated therein as factual is true, and those factual matters

which are stated upon information and belief are believed to be true.

_____
/Ebony M. Lewis

Sworn and subscribed before me on this the __23__ day of __Aug.__, 2012.

_____
Notary Public

My Commission Expires: _____

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 26, 2016
BONDED THRU NOTARY PUBLIC UNDERWRITERS